IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ERIN DICKINSON,                      )
                                     )
            Plaintiff,               )
                                     )
      v.                             )
                                     )
UNIVERSITY OF NORTH CAROLINA,        )
UNIVERSITY OF NORTH CAROLINA         )        1:14cv412
SCHOOL OF THE ARTS; and FRANCO       )
COLAVECCHIA, JOSEPH TILFORD,         )
HOWARD JONES, and VICKI DAVIS,       )
in their individual and             )
official capacities,                 )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Plaintiff, Erin Dickinson, a former graduate student at Defendant University of North Carolina School of the Arts ("UNCSA"), alleges that she was dismissed in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the Rehabilitation Act, 29 U.S.C. §§ 701 et seq. ("Rehabilitation Act"), and North Carolina common law. She names as Defendants the University of North Carolina ("UNC"), UNCSA, and several university employees. Before the court is Defendants' motion to dismiss pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 12.) The motion has been fully briefed and is ready for decision. For the reasons set forth below, Defendants' motion will be granted in

part and denied in part.

I.   **BACKGROUND**

Dickinson's complaint is lengthy.  The essential allegations, taken in the light most favorable to Dickinson, show the following:

Dickinson applied to and was accepted for the graduate program in Scenic Art in the School of Design and Production at UNCSA. (Doc. 9 (Am. Compl.) ¶ 11.)  This master's degree program takes three years to complete, with each year broken into three trimesters.  (Id. ¶ 12.)  The school's academic policy requires students to maintain a grade point average ("GPA") of at least a B, both cumulatively and per trimester.  (Id. ¶¶ 14–15.)  If a student fails to meet this requirement, he or she may be placed on academic probation.  (Id.)  At the close of each school year, students must be invited back for the next year; continuation is not automatic.  (Id. ¶ 46.)

Dickinson has suffered from two medial conditions from adolescence through her time at UNCSA: severe migraine headaches, and polycystic ovary syndrome, "both of which are periodically completely disabling."  (Id. ¶¶ 16, 18.)  Polycystic ovary syndrome can cause Dickinson to be in "debilitating pain" for weeks at a time.  (Id. ¶ 17.)

In her first trimester at UNCSA, fall 2008, one of Dickinson's instructors was Defendant Franco Colavecchia.  (Id. ¶ 19.)  He became ill and was replaced by Defendant Vicki Davis.  (Id. ¶¶ 20–

21.) Davis was not well received by her students because she ridiculed them. (Id. ¶¶ 23–26.) Dickinson and another student approached their advisor, Defendant Howard Jones, about Davis, and eventually filed a written complaint against her. (Id. ¶¶ 26–27.) Dickinson alleges, on information and belief, that Joseph Tilford (Dean of the School of Design and Production) and Jones conveyed the complaint to Davis, who in turn retaliated against Dickinson by giving her a grade of B- for the fall trimester (her worst grade for the term). (Id. ¶ 28.)

Davis continued to ridicule her students in the winter term. (Id. ¶ 30.) Dickinson wore sunglasses in class because the fluorescent lighting triggered severe migraines. (Id. ¶¶ 32–33.) Davis mocked and ridiculed Dickinson for this in front of her classmates. (Id. ¶ 34.) Dickinson again complained about Davis, who again gave Dickinson a B- (her worst grade for the term). (Id. ¶¶ 35–37.) For the 2009 spring term, Colavecchia returned to teaching, and Davis' role substantially declined. (Id. ¶ 38.) Colavecchia assigned Dickinson a grade of B in each of two classes. (Id. ¶¶ 39–40.)

At the end of the first year, based on Dickinson's grades and portfolio presentation, UNCSA extended her a written offer to continue in the program for a second year, which she accepted. (Id. ¶¶ 45–48.) At the end of her second year, Dickinson was again invited to return for her third and final year. (Id. ¶ 59.)

Dickinson accepted the offer, paid the deposit, and applied for financial aid. (Id. ¶ 60.)

Around the time Dickinson was completing her second year, UNCSA decided not to reappoint Davis on tenure track but offered her a terminal teaching appointment for the 2010-2011 school year. (Id. ¶ 62.) One of the reasons for Davis' failure to secure reappointment was student complaints about her teaching, including Dickinson's complaints about being ridiculed for her health issues. (Id. ¶ 63.) Dickinson alleges, on information and belief, that Colavecchia decided to retaliate against Dickinson for her role in getting Davis fired by getting Dickinson expelled. (Id. ¶ 64.)

In summer 2010, after Dickinson had already accepted her third year offer and paid her deposit, UNCSA informed her that she was being dismissed because she had received two grades of F from Colavecchia for incomplete work for the past spring trimester. (Id. ¶ 65.) Dickinson denies that she failed to complete any work. (Id. ¶¶ 66-74.) She was told that her opportunity to make up the grades had passed, requiring her dismissal. (Id. ¶ 67.)

Dickinson appealed unsuccessfully to Colavecchia. (Id. ¶¶ 79-82.) Administrators then tried to avoid meeting with Dickinson, but eventually Tilford did so right before the fall 2010 term began. (Id. ¶¶ 85-102.) Tilford told her that she could only remain in school if she signed a probationary agreement. (Id.

4

¶ 96.) The agreement required Dickinson, unlike all other graduate students, to make at least a B in every class. (Id.) She was also required to retake set design to make up credits for the class Colavecchia claimed she did not complete. (Id. ¶ 97.) Fearing she would lose her financial aid unless she agreed, and doubting that UNCSA administrators would overturn Tilford's decision, she agreed to the terms of probation and began the fall term. (Id. ¶¶ 98–102.) Besides her grades from Davis, Dickinson had never received a grade below a B and believed she could meet the terms of the agreement. (Id. ¶ 101.)

From November 2010 through February 2011, Dickinson had to miss class and had to make up work due to the onset of disabling PCOS symptoms. (Id. ¶¶ 106–22.) She received several grades below a B for the fall and winter terms. (Id. ¶¶ 143, 150–51.) In the spring term, Dickinson received two grades of B-. (Id. ¶¶ 157, 161.) Dickinson alleges that she received these grades below B, as well as being required to do additional work not required of other students, as a result of a conspiracy among UNCSA instructors and administrators to punish her for requesting accommodation of her PCOS symptoms and to ensure she would not graduate. (Id. ¶¶ 164–76.) On May 25, 2011, Dickinson was dismissed from her program for failing to comply with the terms of the probation agreement and was not allowed to graduate. (Id. ¶¶ 162–63.)

On March 28, 2014, Dickinson filed a complaint in a North

Carolina Superior Court. (Doc. 17-1 at 1.) On April 17, 2014, she amended her complaint to add Davis as a Defendant. (Doc. 17 at 1.) Dickinson names as Defendants UNC and UNCSA,[1] as well as Colavecchia, Tilford, Jones, and Davis (the latter four collectively referred to as the "Individual Defendants"). Defendants removed the case to this court on May 21, 2014. (Doc. 1.) The complaint seeks injunctive relief, compensatory damages, punitive damages, attorneys' fees, and costs. (Am. Compl. at 25.) Five claims for relief are asserted: claims for disability discrimination and retaliation under the ADA; claims for disability discrimination and retaliation under the Rehabilitation Act; and a state-law claim of tortious interference with contract under North Carolina law.

Defendants have jointly filed a motion to dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 12) Dickinson responded (Doc. 17), and Defendants replied (Doc. 20). The motion is ripe for resolution.

## II. ANALYSIS

### A. Sovereign Immunity as to Dickinson's State-Law Claim Against the Individual Defendants

Dickinson's fifth claim for relief alleges tortious interference with contract against the Individual Defendants in

---

[1] The parties make no distinction between UNC and UNCSA. Therefore, conclusions as to the validity of claims against UNCSA apply equally to UNC.

both their official and personal capacities. (Am. Compl. ¶¶ 8, 203–12.) To the extent this State-law tort claim is made against these Defendants in their official capacity, Defendants move to dismiss it on grounds of sovereign immunity pursuant to Rule 12(b)(1). (Doc. 13 at 10.)

The defense of sovereign immunity is properly addressed under Rule 12(b)(1). See Anderson v. United States, 669 F.3d 161, 164 (4th Cir. 2011), certified question answered, 46 A.3d 426 (Md. 2012); cf. Smith v. Wash. Metro. Area Transit Auth., 290 F.3d 201, 205 (4th Cir. 2002) (citing Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995)). Ex parte Young, 209 U.S. 123 (1908), permits certain claims to be brought against a State so long as they are styled as claims against State officials sued in their official capacity. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 (1984). But the Young "fiction" does not apply "in a suit against state officials on the basis of state law." Id. at 106, 114 n.25.

Dickinson argues only that it is "unclear" whether sovereign immunity applies to her claim against the Individual Defendants in their official capacity because "the State cannot claim immunity from claims based in contract." (Doc. 17 at 20.) Dickinson misperceives the issue. It is true that the State is not immune from suit for contracts it enters into. Smith v. State, 222 S.E.2d 413, 424 (N.C. 1976). But Dickinson has styled her fifth cause of

action in tort, not contract. North Carolina is immune from tort liability, unless it is waived. White v. Trew, 736 S.E.2d 166, 168 (N.C. 2013). "The North Carolina Torts Claims Act provides a limited waiver of immunity and authorizes recovery against the State for negligent acts of its 'officer[s], employee[s], involuntary servant[s] or agent[s].'" Id. (quoting N.C. Gen. Stat. § 143-291(a) (2011)). But suits against the State based on "intentional acts of these individuals are not permitted." Id. Because tortious interference with contract is an intentional tort, as Dickinson concedes, see Doc. 17 at 19; Beverage Systems of the Carolinas, LLC v. Associated Beverage Repair, LLC, 762 S.E.2d 316, 323 (N.C. App. 2014) (requiring that the inducement of the third person not to perform the contract be intentional), Dickinson has failed to provide any basis for determining that North Carolina has waived its sovereign immunity for it. Thus, Defendants' motion to dismiss the fifth claim for relief will be granted to the extent Dickinson's complaint alleges tortious interference with contract against the Individual Defendants in their official capacity.

Dickinson also brings her fifth claim for relief against the Individual Defendants in their personal capacity. Defendants argue that a personal capacity claim is "without basis because these named Defendants are only being sued for acts from their official capacity, and Plaintiff has failed to allege that these

Defendants did anything outside the scope of their job." (Doc. 13 at 10.)  In response, Dickinson argues that public officials are not immune from claims against them in their personal capacity for the intentional torts they commit. (Doc. 17 at 19.)

Defendants' argument in substance is that this personal-capacity claim cannot proceed because Dickinson has not alleged the prerequisites for holding a public official individually liable for acts committed within the scope of his or her duties. But Defendants have not supported this argument with any analysis or citation to authority.  Under North Carolina law, a public official can be held individually liable for damages when the conduct complained of is malicious or corrupt, as well as when it is outside the scope of official authority; and a public employee can be individually liable "for mere negligence in the performance of his governmental or discretionary duties." Hunter v. Transylvania Cnty. Dep't of Soc. Servs., 701 S.E.2d 344, 346 (N.C. Ct. App. 2010).  Here, Dickinson's amended complaint alleges that the Individual Defendants acted with legal malice (Am. Compl. ¶ 206), and alleges various facts to support that charge. Defendants have not explained how dismissal is appropriate under applicable North Carolina law.  Thus, Defendants motion to dismiss Dickinson's fifth claim for relief against the Individual Defendants in their personal capacity will be denied.

**B.   Personal Jurisdiction**

Second, Defendants move to dismiss for want of personal jurisdiction under Rule 12(b)(2).  (Doc. 12 at 1–2; Doc. 13 at 4.) But Defendants have presented no argument in support of this contention.   The defense is therefore deemed waived, and Defendants' Rule 12(b)(2) motion will be denied.  <u>See</u> Local Rule 7.2(a)(4) (requiring litigants to support their motions with arguments); Local Rule 7.3(k) (providing that a "motion unaccompanied by a required brief may, in the discretion of the Court, be summarily denied").

**C.   Failure to State a Claim**

Finally, Defendants move to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) on two grounds: insufficiency of the complaint and the statute of limitations.

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007)). A 12(b)(6) motion to dismiss "challenges the legal sufficiency of

a complaint considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted).

### 1. Punitive Damages

Dickinson's complaint includes a demand for punitive damages against the Individual Defendants. (Am. Compl. at 25.) The complaint does not indicate in what capacity these damages are sought, and Defendants argue that they are only available against the Individual Defendants in their personal capacity. Dickinson concedes this point in her response brief. (Doc. 17 at 20.) Thus, there appears to be no dispute on this issue, and Defendants' motion to dismiss Dickinson's punitive damages claim will be granted except as to the Individual Defendants sued in their personal capacity as to the fifth claim for relief.

### 2. Statutes of Limitation

A defense based on the statute of limitations is an affirmative defense, which can be the basis of a motion to dismiss under Rule 12(b)(6). Dean v. Pilgrim's Pride Corp., 395 F.3d 471, 474 (4th Cir. 2005). However, since a Rule 12(b)(6) motion aims to test the sufficiency of the complaint, and the burden of proving an affirmative defense rests with a defendant, dismissal under Rule 12(b)(6) based on the statute of limitations occurs in "relatively rare circumstances." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). To succeed on a statute-of-

limitations defense at this stage, all facts necessary to show the time bar must clearly appear "on the face of the complaint."  Id.

### a.    ADA and Rehabilitation Act

The parties disagree on what statute of limitations applies to Dickinson's ADA and Rehabilitation Act claims.  Dickinson argues that the four-year limitation from 28 U.S.C. § 1658 applies, and Defendants urge application of the two-year limitation from N.C. Gen. Stat. § 168A-12.  The determination will be dispositive in this case, because Dickinson was finally dismissed from UNCSA on May 25, 2011 (Am. Compl. ¶ 162), and filed her amended complaint on April 17, 2014.  Thus, her disability discrimination claims are timely under a four-year statute of limitations, but they are tardy under a two-year limitations period.

Dickinson's disability discrimination claims are creatures of federal law, and thus would ordinarily be subject to the applicable federal statute of limitations.  However, when Congress enacted the ADA and Rehabilitation Act, it did not set a limitations period.  Therefore courts must "borrow the state statute of limitations that applies to the most analogous state-law claim." A Soc'y Without a Name v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011) (citations omitted).  For Title II of the ADA and Section 504 of the Rehabilitation Act, the most analogous North Carolina law is the North Carolina Persons with Disabilities Protection Act, which prohibits disability discrimination in public

accommodations, services, and transportation.  See N.C. Gen. Stat. ch. 168A; McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 130 (4th Cir. 1994).  The applicable statute of limitations for non-employment claims under this North Carolina law is two years. N.C. Gen. Stat. § 168A-12; Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 699 (M.D.N.C. 2013).

But, in 1990, Congress enacted the Civil Justice Reform Act of 1990 ("CJRA"), Pub. L. No 101-650, 104 Stat. 5089 (codified in scattered sections of 28 U.S.C.).  In Section 313 of that Act, Congress created a general, catch-all statute of limitations of four years for any "civil action arising under an Act of Congress enacted after" December 1, 1990.  CJRA § 313, 104 Stat. at 5115 (codified as amended at 28 U.S.C. § 1658); see Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004).  In 2004, the Supreme Court considered whether a federal cause of action for a violation of a federal statute that existed before December 1, 1990 — but was amended after December 1, 1990 — gets the benefit of the four-year limitations period of § 1658.  The Court unanimously held that "a cause of action arises "'under an Act of Congress enacted' after December 1, 1990 — and therefore is governed by § 1658's 4-year statute of limitations — if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." Jones, 541 U.S. at 382.

In this case, both relevant acts of Congress were originally

enacted before December 1, 1990. The ADA was originally enacted on July 26, 1990. Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327. The Rehabilitation Act was originally enacted on September 26, 1973. Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355. But Congress amended both of these acts after December 1, 1990. On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553. This act revised the definition of "disability" for both the ADA and the Rehabilitation Act. See id. § 4, 122 Stat. at 3555; id. § 7, 122 Stat. at 3558 (redefining a person with a disability for Rehabilitation Act purposes in terms of the revised definition of disability for the amended ADA).

Under Jones, the statute of limitations that applies to Dickinson's first four claims for relief turns on whether her ADA and Rehabilitation Act claims were "made possible" by the ADAAA's revised definition of disability. Jones, 541 U.S. at 382. Before the ADA was amended in 2008, it defined the disability of an individual, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." ADA § 3(2)(A), 104 Stat. at 329-30 (current version at 42 U.S.C. § 12102(1)(A)). The act itself contained no further definition of "physical or mental impairment," "substantially limits," or "major life activities." See id.

Before the ADAAA's enactment, the federal courts had

14

interpreted these key terms of the definition of disability. In 1999, the Supreme Court held that "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity." Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999), overturned by statute, ADAAA § 4, 122 Stat. at 3556 (codified at 42 U.S.C. § 12102(4)(E)). Relying in part on Sutton, and ruling prior to the ADAAA's enactment, the Fourth Circuit adopted a similarly limiting construction of "substantially limits":

> [T]he EEOC first asserts that Turpin's disability can be established under an "intermittent manifestation" theory of disability. . . . Here, the alleged intermittent manifestation (the seizure) is the disability itself. To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds. An intermittent manifestation of a disease must be judged the same way as all other potential disabilities. The statute is explicit — to be disabled under the ADA, a person must have a substantial limitation on a major life activity.

EEOC v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001).

The following year, in 2002, the Supreme Court echoed the reasoning of Sara Lee. In Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, the Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily

15

lives. The impairment's impact must also be permanent or long term." 534 U.S. 184, 198 (2002), abrogated in part by ADAAA § 4, 122 Stat. at 3556 (codified at 42 U.S.C. § 12102(C)–(D)). Relying on these statements of the law, the Fourth Circuit explained in 2004 that,

> although [plaintiff] appears to be almost completely incapable of interacting with others during her episodes, her episodes are sporadic and last, at most, thirty minutes. During the four months of her employment with [defendant], [plaintiff] appears to have experienced approximately thirty episodes. Intermittent manifestations of an illness are insufficient to establish a substantial limitation on a major life activity.

Rohan v. Networks Presentations LLC, 375 F.3d 266, 276 (4th Cir. 2004) (citing Sara Lee, 237 F.3d at 352); see also id. at 276 n.18 ("As we explain above, we recognize that Rohan is substantially incapacitated during her episodes, but these episodes occurred, at most, slightly more than twice per week on average. Under the ADA, the frequency of [plaintiff's] episodes simply do not establish a substantial limitation, regardless of each individual episode's severity." (citations omitted)).

After passage of the ADAAA, however, these cases no longer reflect current law. See Jacobs v. N.C. Admin. Office of the Courts, No. 13-2212, ___ F.3d ___, 2015 WL 1062673, at *9 (4th Cir. Mar. 12, 2015) (observing that "[i]n enacting the ADAAA, Congress abrogated earlier inconsistent caselaw"); Matarese v. Archstone Pentagon City, 795 F. Supp. 2d 402, 434 n.15 (E.D. Va.

16

2011) ("Both <u>Rohan v. Networks Presentations LLC</u> and <u>EEOC v. Sara Lee Corp.</u> rely heavily on Supreme Court cases that were expressly rejected by the 2008 amendments to the ADA."), <u>aff'd in part, vacated in part on other grounds sub nom. Matarese v. Archstone Communities, LLC</u>, 468 F. App'x 283 (4th Cir. 2012) (per curiam). In passing the ADAAA, Congress explicitly expressed, in its "purposes" section, its disagreement with the Supreme Court's interpretations of the ADA in <u>Toyota</u> and <u>Sutton</u>, and the applications of those cases by the lower federal courts. ADAAA § 2(b)(2)-(5), 122 Stat. at 3554. Congress enacted several "rules of construction" intended to overrule these cases:

> The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

> (A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

> (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

> (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

> (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

> (E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . .

_Id._ § 4, 122 Stat. at 3555–56 (codified at 42 U.S.C. § 12102(4));
_see also_ _Carmona v. Sw. Airlines Co._, 604 F.3d 848, 855 (5th Cir.
2010) ("These amendments would be very favorable to Carmona's case
if they are applicable, because they make it easier for a plaintiff
with an episodic condition like Carmona's to establish that he is
an 'individual with a disability.'").

Defendants do not attempt to explain how Dickinson's claims
would have been viable under the ADA and Rehabilitation Act as
they existed before the ADAAA, and it is not entirely clear that
they would have been. In her complaint, Dickinson alleges that
she suffers from "severe migraine headaches and a disorder known
as Polycystic Ovary Syndrome or PCOS, both of which are completely
disabling. When symptomatic, the illnesses substantially limit
major functions — including sleeping, eating, walking, standing,
communicating and interacting with others, concentrating, and
doing manual tasks." (Am. Compl. ¶ 16.) The pain from the ovarian
cysts cause Dickinson "debilitating pain that can last for weeks."
(_Id._ ¶ 17.) She has had these conditions from adolescence,
continuing up and through her studies at UNCSA. (_Id._ ¶ 18.)

In _Rohan_, the unsuccessful plaintiff suffered from PTSD and
depression. 375 F.3d at 273. The _Rohan_ court held that these
medical problems did not establish a substantial limitation on a
major life activity. _Id._ at 276. Despite suffering from totally
disabling episodes that lasted up to thirty minutes, at an average

18

frequency of about one episode every four days, Rohan's
"[i]ntermittent manifestations of an illness [were] insufficient
to establish a substantial limitation on a major life activity."
Id. The Rohan court likened the case to the situation in Sara
Lee, where the plaintiff suffered from epilepsy. Id. The Sara
Lee court held that the seizure, rather than the epilepsy itself,
was the disability. 237 F.3d at 352. Despite experiencing life-
long seizures multiple times per week that resulted in physical
injury, memory loss, sleep loss, not to mention total
unresponsiveness during the seizure, id. at 351, the court could
not find a substantial limitation on a single, major life activity,
id. at 352–53.

Juxtaposing Sara Lee and Rohan with this case, the court is
not persuaded that Defendants have demonstrated that Dickinson's
allegations of disability would have been sufficient to state a
claim before the ADAAA, thus requiring application of the two-year
statute of limitations. See 42 U.S.C. § 12102(4)(D) ("An
impairment that is episodic or in remission is a disability if it
would substantially limit a major life activity when active.").
Consequently, the court cannot say that Dickinson's claims are
barred under the two-year limitations period as a matter of law,
and she is entitled to proceed for now with application of the
four-year statute of limitations of 28 U.S.C. § 1658 because she

brought her claims within that window.[2]  Defendants' motion to
dismiss on this ground will therefore be denied.

### b.    Tortious Interference with Contract

The statute of limitations for the State-law claim of tortious
interference with contract is three years.  N.C. Gen. Stat. § 1-
52(5); Glynne v. Wilson Med. Ctr., 762 S.E.2d 645, 649 (N.C. Ct.
App. 2014) (applying § 1-52(5)).[3]  Dickinson argues that the
limitations period did not begin until May 25, 2011, the day she
was ultimately expelled, under the continuing violation doctrine.
(Doc. 17 at 19.)  In reply, Defendants say nothing about the
applicability of this doctrine.

In North Carolina, the general rule is that a cause of action
"accrues as soon as the right to institute and maintain a suit
arises."  Williams v. Blue Cross Blue Shield of N.C., 581 S.E.2d
415, 423 (N.C. 2003) (citations omitted).  An exception exists for
continuing violations:  "When this doctrine applies, a statute of
limitations does not begin to run until the violative act ceases.
A continuing violation is occasioned by continual unlawful acts,

---

[2] Whether Dickinson states a plausible claim for relief under the ADAAA's
changes is considered in Part II.C.3.a, infra.

[3] There is conflicting authority from the North Carolina Court of Appeals
as to whether the statute of limitations for tortious interference with
contract is governed by N.C. Gen. Stat. § 1-52(5) or § 1-52(1).  See
Philips v. Pitt Cnty. Mem'l Hosp. Inc., 731 S.E.2d 462, 468-69 (N.C. Ct.
App. 2012) (applying § 1-52(1)).  The difference is immaterial in this
case since, as all parties agree, both sections apply a three year
limitations period.

not by continual ill effects from an original violation." Id. (citations and quotation marks omitted).

Under the Rule 12(b)(6) standard, where dismissal for statute of limitations is rarely warranted, Defendants have made no effort to show that the continuing violation doctrine does not apply, and the court finds that the complaint pleads tortious acts continuing up to and including her expulsion on May 25, 2011. Therefore, the fifth claim for relief will not be dismissed on this ground.

### 3. Plausibility

#### a. Federal Statutory Claims Against the Individual Defendants

Defendants argue that Dickinson's ADA and Rehabilitation Act claims cannot proceed against the Individual Defendants in either their official or individual capacity. (Doc. 13 at 7-8.) But Dickinson brings her ADA and Rehabilitation Act claims against the Individual Defendants in their official capacity only (Am. Compl. ¶ 8), a point Dickinson makes clear in her response brief (Doc. 17 at 15).

Defendants cite no authority for dismissing the claims against the Individual Defendants in their official capacity. Rather, a claim against a "state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Michigan Dep't of State

<u>Police</u>, 491 U.S. 58, 71 (1989) (citation omitted).  Therefore, dismissal is not warranted on this basis at this time.[4]

### b.  Disability Discrimination

#### i.  ADA

Dickinson's first claim for relief is for disability discrimination under the ADA.  Under Title II of the ADA, a claim for disability discrimination lies where a qualified individual with a disability is "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity, or [is] subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided

---

[4]  Claims against the Individual Defendants in their official capacity may be redundant of some or all of the claims against UNC and UNCSA. <u>See, e.g.</u>, <u>Munoz v. Baltimore Cnty., Md.</u>, No. CIV.A. RDB-11-02693, 2012 WL 3038602, at *5 (D. Md. July 25, 2012) ("As the Plaintiff has filed [ADA] claims against Baltimore County, his claims against the individual supervisors employed by the County in their official capacities are redundant.  Therefore, the Plaintiff's ADA and Rehabilitation Act claims against each individual defendant in his official capacity are DISMISSED WITH PREJUDICE."); <u>Adams v. Montgomery Coll. (Rockville)</u>, 834 F. Supp. 2d 386, 396 (D. Md. 2011) (noting that, since claim against public community college was valid, there was no need to pursue official capacity claim against administrators); <u>Fink v. Richmond</u>, No. CIV.A DKC 2007-0714, 2009 WL 3216117, at *4 (D. Md. Sept. 29, 2009) ("Plaintiff has sued the government agency and the redundant claim against Richmond in his official capacity should be dismissed if any portion of the complaint goes forward."), <u>aff'd</u>, 405 F. App'x 719 (4th Cir. 2010). Because Defendants have not raised this argument, the court does not address it at this time.

by a public entity." 42 U.S.C. § 12131(2).

Defendants argue that Dickinson has failed to plead two required elements of an ADA disability discrimination claim: (1) that she was "otherwise qualified to complete the graduate school program," and (2) "that she was dismissed from the graduate school program by reason of her disability." (Doc. 13 at 16.)

Defendants' first argument is inaccurate. Dickinson has alleged that, aside from the grades assigned by the Individual Defendants, she had no grades below a B for any trimester during her first two years. Nor had her cumulative or term GPA ever dropped below a 3.0 during those two years, which is all that was required to avoid being put on academic probation. (Am. Compl. ¶ 29.) Considering Dickinson's GPA, the "positive feedback" she received on her portfolios (id. ¶¶ 47, 59), the ability of the school to extend extra time for projects due to physical disability (see id. ¶¶ 51–55), Dickinson's requests for accommodation in the form of additional time to complete coursework (Id. ¶¶ 168–69), and UNCSA's invitation for Dickinson to return for her final year (id. ¶ 60), the plausible inference is that, with additional time and without a discriminatory probation agreement, Dickinson could have completed her assignments.

Defendants' second argument is equally unpersuasive. Dickinson need not plead that she was dismissed directly because of her disability. Dismissal from school is but one way to

discriminate under Title II.  Discrimination occurs not only when a disabled student is "excluded from participation" in a public academic program through expulsion, but also when the student is "denied the benefits of the services, programs, or activities" of a college.  42 U.S.C. § 12132.  Dickinson pleads that subjecting her to unreasonable time demands and a probation agreement lacking any basis in university policy were discriminatory and ultimately led to her dismissal.  (Id. ¶¶ 170, 172–73.)  Defendants have offered no reason why these actions, if true, cannot count as discrimination.  Therefore, Defendants' motion to dismiss on this basis will be denied.

### ii.  Rehabilitation Act

Dickinson's second claim for relief charges disability discrimination under the Rehabilitation Act.  Section 504 of the Rehabilitation Act is similar to the ADA, but stricter.  Under that Act, a claim for disability discrimination lies where an "otherwise qualified individual with a disability" is "solely by reasons of her or his disability . . . excluded from the participation in, . . . denied the benefits of, or . . . subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  A "qualified individual with a disability" is defined the same as it is under the ADA.  See 29 U.S.C. § 705(20)(B).

Defendants argue that the complaint is insufficient under the

Rehabilitation Act because Dickinson fails to plead (1) that she was otherwise qualified to complete the graduate school program, and (2) "that she was dismissed from the graduate school program solely because of her disability."  (Doc. 13 at 16.)  Both arguments are unpersuasive.

Argument one fails for the same reasons given above for the ADA discrimination claim.  As to the second argument, Defendants are correct that Dickinson never alleges that any of the actions were taken against her solely because of her disability.  However, under <u>Twombly</u> and <u>Iqbal</u>, even if she had had made such an allegation, it would not have been accepted as true for purposes of Rule 12(b)(6) because a plaintiff's grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555 (citations omitted).  Yet, the facts alleged in the complaint make plausible her ultimate claim that she was placed on academic probation because of disability discrimination.  Therefore, Dickinson has pleaded a plausible claim for disability discrimination under the Rehabilitation Act, and Defendants' motion to dismiss will be denied.

### c.    Retaliation

For her third and fourth claims for relief, Dickinson alleges retaliation in violation of the ADA and Rehabilitation Act, respectively.  To state a claim for retaliation under both of these

acts, a plaintiff must "allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002) (citing Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001)).[5] Although a plaintiff "need not establish that the conduct she opposed actually constituted an ADA violation," she must allege "the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA." Id. (citations omitted). Defendants argue that Dickinson's complaint fails. The court disagrees.

Dickinson alleges that she engaged in conduct protected by the ADA when she requested accommodations (Am. Compl. ¶¶ 185, 188–90); that she subsequently suffered adverse action in the form of destroyed evidence, heightened academic standards, bad grades, extra work assignments, and expulsion (id. ¶¶ 186–92); and causal links exist between all her protected conduct and the adverse actions (id. ¶¶ 185–92). These allegations are sufficient at this stage.[6]

---

[5] Neither party raises any argument about the standard of the causal connection required, so the court has not considered it. Cf. Gallagher v. San Diego Unified Port Dist., 14 F. Supp. 3d 1380, 1385–88 (S.D. Cal. 2014) (discussing effect of Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013) on ADA retaliation claims).

[6] Defendants also argue that various other matters should have been

### d. Tortious Interference with Contract

Tortious interference with contract, Dickinson's fifth claim for relief, has five elements under North Carolina law:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

Embree Const. Grp., Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992) (citations omitted).  As noted earlier, Dickinson alleges her fifth cause of action only against the Individual Defendants. (Am. Compl. ¶ 205.)

Defendants claim the complaint is insufficient in two primary ways.  First, they argue that Dickinson has not alleged facts showing a contract between her and UNCSA.  (Doc. 13 at 18.)  This is incorrect.  Dickinson's complaint alleges that she "had at [sic] contract with UNC and UNCSA to obtain her graduate degree." (Am. Compl. ¶ 204.)  At this stage of litigation, this allegation suffices.  See, e.g., Rouse v. Duke Univ., 869 F. Supp. 2d 674, 683 (M.D.N.C. 2012) ("A current student in good standing who is paying her tuition and other fees would seem to have a contractual

---

alleged to avoid dismissal.  (Doc. 13 at 17–18.)  First, it is clear that several of these arguments are factually inaccurate; for example, contrary to the Defendants' arguments, Dickinson did plead that UNCSA had notice of her disability.  (Am. Compl. ¶ 166.)  Second, none of these additional "perfunctory" arguments is supported by authority or explanation, and so none will be considered further.  See Hayes, 2014 WL 4198412, at *2.

right to return to school, nothing else appearing."). Further, Defendants themselves go on to describe what they believe were the terms of the contract. (Doc. 13 at 18–19.) Second, Defendants argue that Dickinson failed to allege that the Individual Defendants "intentionally induced UNCSA not to allow [Dickinson] to complete the graduate school program." (Doc. 13 at 19.) This, too, is incorrect. Dickinson alleges generally that the Individual Defendants intentionally induced UNCSA to breach the contract (Am. Compl. ¶ 206) and enumerates the way each Individual Defendant acted to do so (id. ¶¶ 207–12). Therefore, Defendants' motion to dismiss the tortious interference claim on this ground will be denied.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that Defendants' motion to dismiss (Doc. 12) is GRANTED as to the fifth claim for relief against the Individual Defendants in their official capacity, which is DISMISSED WITH PREJUDICE, and GRANTED as to Plaintiff's claim for punitive damages, which is DISMISSED WITH PREJUDICE, except as against the Individual Defendants sued in their personal capacity, which survives. Defendants' motion to dismiss is otherwise DENIED.


　　　　　　　　　　　　　　　　　　 /s/   Thomas D. Schroeder
　　　　　　　　　　　　　　　　　　 United States District Judge
March 16, 2015